J-A26014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RICKY EDWARD LARSON, | |
| Appellant | No. 4 MDA 2014 |

Appeal from the Judgment June 21, 2013
In the Court of Common Pleas of Lebanon County
Criminal Division at No(s): CP-38-CR-0000601-2012

BEFORE:  BOWES, MUNDY, and JENKINS, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 16, 2014**

Ricky Edward Larson appeals from the judgment of sentence of two days to six months incarceration imposed after the trial court found him guilty of driving under the influence of alcohol ("DUI") high rate and DUI general impairment.  We affirm.

The trial court delineated the following relevant facts.

On December 17, 2011, multiple [Pennsylvania State Police ("PSP")] Troopers responded to the scene of a two vehicle crash that took place on Pennsylvania Route 934 in northern Lebanon County.  According to the investigation that ensued, a vehicle operated by [Appellant] was traveling south on Route 934.  A pick-up truck operated by an individual whose name was not disclosed pulled into [Appellant's] lane of travel and stopped. [Appellant] was not able to avoid the pick-up truck and a collision occurred.  According to Trooper Brian Jasinski, [Appellant] enjoyed at least one hundred yards of clear visibility as he was proceeding toward the scene of the accident.  Trooper Jasinski testified that [Appellant] could and should have avoided the stopped pick-up truck.

Following the crash, Trooper Travis Messenger interacted with [Appellant]. He noticed an odor of alcohol, slurred speech, as well as bloodshot, glassy eyes. He testified that [Appellant] was swaying as he walked. In addition, [Appellant] advised Trooper Messenger that he and his wife were driving from the Hollywood Casino, where each had been drinking alcohol. After observing these characteristics, Trooper Messenger asked [Appellant] to submit to field sobriety tests. [Appellant] refused. Based upon all of these facts, Trooper Messenger determined that [Appellant's] physical and mental state would prevent him from safely operating his motor vehicle. Tooper Messenger placed [Appellant] under arrest for suspicion of DUI and transported him to the PSP Barracks in Jonestown, Pennsylvania for processing.

When [Appellant] was taken to the PSP Barracks for processing, he was turned over to Trooper Christopher O'Brien, a certified Datamaster breath test operator and a certified Datamaster maintenance operator. Trooper O'Brien performed a breath test upon [Appellant]. According to Trooper O'Brien, [Appellant] provided two breath samples. One resulted in a reading of .170 [blood alcohol content ("BAC")] and the other resulted in a [BAC] reading of .173.

A [p]re-[t]rial [h]earing was held on August 22, 2012 for [Appellant's] [o]mnibus [p]retrial [m]otion to [s]uppress. At that [h]earing, [Appellant] argued that Trooper Messenger lacked sufficient probable cause to arrest [Appellant]. The [c]ourt heard testimony from Troopers Jasinski and Messenger about the occurrences of the December 17, 2011 accident. Based on [the] totality of the circumstances, [the] [c]ourt disagreed with [Appellant's] premise and found sufficient probable cause for the arrest.

A bench trial was held on June 21, 2013, at which several witnesses testified, including expert witness Dr. Jimmy Valentine. Dr. Jimmy Valentine provided expert testimony and corresponding charts in support of his position that the Datamaster device was unreliable. In [the trial court's] July 1, 2013 [o]pinion, after considering Dr. Valentine's testimony in light of all other evidence and testimony, [the court] concluded that the Datamaster's findings were reliable enough to determine beyond a reasonable doubt that the [Appellant's] blood alcohol content exceeded .10 percent.

Trial Court Opinion, 2/6/14, 3-5.

The court found Appellant guilty of DUI--high rate as a lesser included offense of the charged crime of DUI—highest rate, and DUI general impairment. The court sentenced Appellant on the DUI high rate charge to two days to six months imprisonment and imposed no further penalty on the additional charge. Appellant filed a timely post-sentence motion, which the trial court denied by order and opinion on November 25, 2013. This appeal ensued. The trial court directed Appellant to file and serve a concise statement of errors complained of on appeal. Appellant complied, and as it relates to the issues presented herein, the trial court indicated in its Pa.R.A.P. 1925(a) opinion that the reasons for its decision could be found in its November opinion. The matter is now ready for our consideration.

Appellant sets forth two issues for this Court's review.

1. Whether the [t]rial [c]ourt erred in finding the Appellant guilty of 75 Pa.C.S.A. § 3802(b) because said verdict was against the weight of the evidence as the [Appellant's] result as presented by the Commonwealth was not shown to be scientifically reliable or trustworthy. The expert qualified for the defense elaborated on numerous areas of concern including the provided breath flow rates for the duplicate breath samples, volume of Appellant's breath samples, the machine being taken out of service on four occasions within twelve months, the accuracy testing done by using the same lot of solution as the calibration, and breath test temperatures. These were specific allegations of error supported by scientific, peer reviewed data and notwithstanding all the facts, these facts were so clearly of greater weight that to ignore them or to give them equal weight with all the facts denied justice.

> 2. Whether the trial court's verdict of guilt as to DUI: General Impairment was against the weight of the evidence because the Commonwealth's evidence did not establish that the [Appellant's] mental and physical faculties were impaired such that he could not safely operate a motor vehicle?

Appellant's brief at 1.

As both of Appellant's issues implicate the weight of the evidence, we address them together. Our standard and scope of review for evaluating weight of the evidence claims is settled. "Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis removed). Accordingly, "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Id*.

A trial judge should not grant a new trial due to "a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id*. Instead, the trial court must examine whether "'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" *Id*. Only where the jury verdict "is so contrary to the evidence as to shock one's sense of justice" should a trial court afford a defendant a new trial. *Id*. A weight of the evidence issue concedes that sufficient evidence

- 4 -

was introduced. ***Commonwealth v. Charlton***, 902 A.2d 554, 561 (Pa.Super. 2006).

Appellant's argument boiled down to its simplest statement is that the expert testimony of Dr. Valentine established that the BAC test results in this case were wholly unreliable. According to Appellant, to find that the BAC test results in this case indicated that Appellant had at least a BAC of .10 to .16, rather than accept the extensive testimony of his expert, was to give the test results greater or equal weight than was warranted and denied justice.

We summarize Dr. Valentine's testimony. Dr. Valentine, an expert who has testified solely on behalf of the criminal defense bar, opined that the DataMaster DMT machine used in this case required a volume of at least 1.5 liters of air. Appellant provided 2.0 liters for the test that yielded a .170 BAC and 3.0 liters for the test that resulted in a .173 BAC. According to Dr. Valentine, the greater the volume of air blown into the machine, the higher the BAC the machine yields. He posited that Appellant's tests were unreliable because of the elevated volume of breath.

In addition, Dr. Valentine asserted that the simulator solutions used to test a breath test machine are calibrated at 34 degrees centigrade, but that human breath is not always that temperature. The higher the breath temperature, the higher the BAC result. Human breath is on average 34.9 degrees centigrade. Dr. Valentine also was troubled by the fact that the

machine in this case had been taken out of service four times, although he had no knowledge of why that occurred.

Dr. Valentine further took issue with the manner in which the Pennsylvania State Police tested the machine's accuracy. To test the breathalyzer, a solution simulating a .10 BAC was used. In Dr. Valentine's view, the Commonwealth used a solution from the same lot number in its accuracy test as its calibration test. According to Dr. Valentine, if you utilize the same solution for calibration and accuracy testing, the machine is told what to expect. Instead, Dr. Valentine maintained that calibration testing should be done with a solution from a totally different source. Dr. Valentine admitted that the PSP used different bottles of solution, but since those bottles were coming from the same lot, the solution was the same.

Further, Dr. Valentine questioned the manner in which the PSP calibrated the machine. He noted that the machine was calibrated measuring a BAC between .05 and .15. Since Appellant's BAC exceeded that range, he reasoned that one could not, in scientifically reliable fashion, determine the accuracy of the test. He recognized that after Appellant's test, the PSP tested the machine at ranges of .20, .25, and .30, but contended that there was no scientific basis to extrapolate those results to Appellant's earlier test.

In contrast, Trooper O'Brien testified that the breath test machine he used in this matter was certified to conduct BAC tests. He further stated

that the machine was properly calibrated. The calibration check indicated that the machine was providing test results within the acceptable ranges of the true BAC. Trooper O'Brien also asserted that the machine used in this case was verified to be accurate, and that the BAC results were .170 and .173. The Commonwealth introduced into evidence certificates of breath test device accuracy and breath-testing device calibration.

The trial court here was free to reject the testimony of Appellant's expert as to the total unreliability of Appellant's BAC testing and accept Trooper O'Brien's testimony. The court specifically found Trooper O'Brien credible and credited his testimony. It determined that the solution used to test the accuracy of the machine was not provided by the manufacturer of the machine and was independently verified by two separate laboratories. Nonetheless, the court did opine that it could not find beyond a reasonable doubt that Appellant's BAC was .170. However, it found it illogical to conclude that the machines results were so unreliable that Appellant's BAC did not fall within the mid-level DUI range. In doing so, the court reasoned,

> To accept [Appellant's] argument, one would have to believe that the linear progression created by the Datamaster machine would make an abrupt and dramatic u-turn as soon as the instrument response exceeded the amount necessary to generate a .15 blood alcohol result. To believe that the linear progression would make such a "u-turn" one would have to conclude that two different "instrument responses" would trigger the exact same blood alcohol reading. It is neither logical nor likely that the linear progression line described by Dr. Valentine would make a dramatic u-turn in order to create a situation where two separate instrument responses would generate the

exact same blood alcohol content for every BAC reading between .08 and .15.

Trial Court Opinion, 7/1/13, at 15 (footnote omitted).

The court added that the evidence demonstrated that the machine in this case was accuracy checked after Appellant's testing for solutions of .20 and .30 percent, in 2013, and worked properly. It opined that this was circumstantial evidence that the Datamaster machine was capable of accurately measuring BAC results that exceeded .15 percent at the time of Appellant's tests. We find that the trial court did not abuse its discretion in using this reasoning to find that its verdict was not so contrary to the evidence that it shocked the trial court's conscience.

Moreover, the facts demonstrate that Appellant was unable to stop his vehicle from striking another despite ample visibility and time to do so. Appellant had slurred speech, swayed while standing, had bloodshot eyes, indicated that he had been drinking, and refused field sobriety tests. All of this is circumstantial evidence that Appellant was driving under the influence. Accordingly, we find his second weight of the evidence issue relative to his general impairment charge to be wholly without merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/16/2014